Filed 3/17/15  Cohen v. Sterling CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ROBYN COHEN, | B247899 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC429389 ) |
| v. | |
| DONALD STERLING, Individually and as Trustee, etc., | |
| Defendant and Respondent. | |

APPEAL from orders and a judgment of the Superior Court of Los Angeles County, William A. MacLaughlin, Judge.  Affirmed.

Henri Law Group, Brian D. Henri; Watkins Bradley, Stephanie F. Bradley; Covington & Burling, Mark W. Mosier and David Zionts for Plaintiff and Appellant.

Horvitz & Levy, John A. Taylor Jr., Steven S. Fleischman; Murchison & Cumming, Guy R. Gruppie, Heather L. Mills and Eric P. Weiss, for Defendants and Respondents.

# I. INTRODUCTION

Plaintiff, Robyn Cohen, appeals from a February 15, 2013 partial judgment notwithstanding the verdict and new trial orders in favor of defendant, Donald Sterling. Mr. Sterling was sued individually and as a trustee of the Sterling Family Trust and as doing business as Beverly Hills Properties. Defendant appeals from the February 15, 2013 order denying in part his partial judgment notwithstanding the verdict motion and cross-appeals from the December 18, 2012 judgment in plaintiff's favor. Plaintiff contends: the trial court erred in partially granting defendant's judgment notwithstanding the verdict and a new trial motions on her intentional emotional distress infliction claim; the trial court erred in granting a new trial on compensatory damages; the trial court erred in granting the partial judgment notwithstanding the verdict and new trial motions on the *amount* of the punitive damage award; and the trial court erred in granting a new trial on claims and issues upon which the court and jury agreed and on claims defendant never challenged. In defendant's appeal, he contends his partial judgment notwithstanding the verdict motion should have been granted on the cause of action for tortious breach of the warranty of habitability. Further, defendant argues the punitive damage award, as reduced by the trial court, violates due process. In defendant's protective cross-appeal, defendant contends that, if the new trial order is reversed, the December 18, 2012 judgment should be reversed. Defendant assigns as the grounds for reversal the reasons specified in the new trial order and relies on evidentiary and instructional error grounds. We affirm.

# II. FACTUAL BACKGROUND

## A. Plaintiff's Case

Plaintiff rented unit No. 201 in an apartment building in West Hollywood, California (the premises). The premises consisted of 54 units that were owned and

2

managed by defendant doing business as Beverly Hills Properties. Defendant relied on three levels of supervision of his 130 apartment properties: a resident manager; a supervisor in the main office; and a senior property supervisor who oversaw all 130 properties. As to the premises where plaintiff resided: the building's resident manager was Lauricia Bustamante; Julie Dexs was Ms. Bustamante's supervisor; and Philomena Wong was the senior property supervisor.

## 1. The fire

On September 28, 2009, there was a fire at the premises caused by a failure of electrical equipment or a heat source. Tenants had complained to the building's manager about the electrical and heating systems prior to the fire. The fire was caused by an electrical malfunction in the bathroom of unit No. 102—the tenant had left on the electric fan, which lacked a timer. A timer would have prevented the heater from staying on so long it could cause a fire.

In the afternoon of September 28, 2009, Plaintiff heard a faint sound from the elevator and went out into the hall. She found smoke filling up the hallway emanating from light fixtures. She screamed to alert her neighbors. She rode down the smoke-filled elevator feeling panicked. She called the fire department. Fire trucks arrived about 10 minutes later. Plaintiff stood outside and watched the building go up in flames. She was outside for eight or nine hours. Her entire apartment was charred and shredded.

Due to defects in the fire alarm system, the fire burned for a long duration and grew to a large size before the alarm was activated. By the time the fire department received the alarm, the flames had gained a lot of headway and had become a multiple alarm conflagration. Plaintiff and other tenants reported to Ms. Bustamante that the mini-horns in their apartments did not work. This information was also passed on to Ms. Wong. Ms. Bustamante did not tell the city inspector, who came that night, that the fire alarm system did not work.

3

## 2. Maintenance of the fire alarm system before the fire

The fire alarm system consisted of: a central fire alarm system; smoke detectors in the hallway designed to notify the main system; big bells in the hallway; and mini horns in each apartment. Fire and smoke triggered the big bells in the hallway and the mini horns. The central fire alarm could be triggered by a heat detector on the roof, corridor smoke detectors or pull stations. The only alarm in each apartment was the mini horn and its purpose was to alert the tenant to a fire in the building. When the central alarm is triggered, the mini-horn in each apartment is supposed to go off.

Fire alarm systems in apartment buildings are required by law to be operational at all times. When defects in the system are found, they are required to be repaired immediately. The building's owner is responsible by law for the inspection, testing and maintenance of the system. In addition, the building's owner is responsible for ensuring the fire and life safety systems are at all times maintained in an operable condition. The accepted practice is to inspect the fire and light safety systems at least once a year. Inspection records are required to be maintained. Each apartment in a building this size is required to have a mini horn.

The system had not been inspected for at least a year prior to the fire. There was a verbal, not written, policy that the building managers must have an alarm company inspect the fire alarms and extinguishers annually. Ms. Bustamante was unaware the law required annual inspections of the fire alarm system. Defendant did not train Ms. Bustamante that the system needed to be inspected annually. The previous manager of the premises, Claude Johnson, who had health issues, failed to maintain the building. The building had outstanding maintenance issues when Ms. Bustamante became manager upon Mr. Johnson's death.

### 3. Conditions found by post-fire inspection

Widespread fire code violations and inoperability were revealed by an EC Fire Company inspection of the system on October 26, 2009: significant defects were found in the detection, alarm, water hose and emergency lighting systems; 52 mini horns were inoperable; the fire alarm control panel, including the system initiation circuit, 2 neck circuit, and annunciator, were in terrible condition; all 12 corridor smoke detectors were defective; bells on each of the tenant floors were in defective condition; there was no ability to fight a fire on the roof because the wet stand pipes, which have hoses attached to them, were in an inoperable condition, including all the control valves being corroded; and emergency lighting, which lights the way to the exits when power is lost, was defective. These conditions were "serious" and "atrocious," created a grave life safety situation and rendered the building unsafe for occupancy. Defendant did not meet the standard of care for maintenance of the building.

The nature and extent of the defects that were found upon inspection indicated the defects occurred over a long period of time, which showed a failure to inspect. The fact that only 5 of the 54 apartment units had been damaged by the fire or water meant that 47 of the 52 mini-horns were old and worn out and did not work. The following bells were defective and not working at the time of the fire: the north and south of the third floor; north and south of the second floor; and north of the first floor.

### 4. Defendant's conduct toward plaintiff after the fire

Plaintiff's apartment was uninhabitable and the City of West Hollywood prohibited occupancy. Ms. Bustamante did not offer plaintiff a place to stay the night of the fire or temporary housing at any time. Subsequently, defendant offered plaintiff a choice of two unfurnished apartments in the building. But the building was in a state of disrepair, smelled terrible, was unsafe and the fire protection systems had not been installed. And plaintiff had no furniture with which to furnish either unfurnished

5

apartment. Plaintiff was told the building was not responsible for her ruined furniture and would not reimburse her for her destroyed property, temporary lodging or relocation.

Ms. Bustamante spoke to plaintiff about the October rent. Plaintiff was told she had to pay rent for October. Further, in that conversation concerning the October rent, plaintiff was told that if she failed to pay it, she would be evicted. Ms. Wong directed Ms. Bustamante to so state to plaintiff. Ms. Bustamante knew plaintiff would be upset by the demand for rent and eviction threat. Plaintiff was told it would be very difficult to rent an apartment anywhere else in the city if she were evicted and her credit rating would be damaged. On October 11, 2009, plaintiff gave Ms. Bustamante the apartment keys and left for the East Coast to work.

### 5. Plaintiff's damages

#### a. economic loss

Plaintiff's furniture was destroyed either by the fire or efforts to extinguish it. Her iPod and a diamond necklace were missing from her apartment. And $5,000 worth of clothing was destroyed. In addition, she spent three or four thousand dollars on dry cleaning. Almost none of her furniture was salvageable. Her entertainment system and all her food items were unsalvageable.

Plaintiff saw a psychotherapist every two weeks at a cost of $200 per session, which was not covered by insurance. Plaintiff, who was an actor, had a much harder time making a living in the entertainment field after the fire. She did not book any commercials for two years. In 2009, plaintiff earned approximately $40,000 and less than that in 2010. Also, 2011 was not a good year and she had even fewer credits in 2012. Plaintiff's rent was $1,000 per month. Her current rent was $1,650.

6

b.  emotional distress

Symptoms plaintiff experienced after the fire were headaches, horrible nightmares, panic, sleeplessness, nausea and shortness of breath.  She felt panic every day, all day, for weeks after she returned to her apartment to try to salvage her property.  Plaintiff felt overloaded and was shaking all the time.  She was unable to spend a week in Massachusetts, as she had planned, visiting her brother, who had brain cancer, prior to starting work in New York.  When he died in January 2010, plaintiff experienced despair and heartbreak.

She returned to Los Angeles in mid-January 2010 but had no place to live.  Plaintiff was in real despair and had a lot of what she characterized as "crazy" feelings.  Plaintiff's mother came from Maryland to help in the search for a new apartment.  They went to about 100 apartments in an effort to find a place for plaintiff to live.  It took almost one month to find an apartment.  Plaintiff was in such a fury about having to start over again setting up an apartment.  This occurred as plaintiff was grieving about her brother's death and parents' separation during their own time of grief.  Plaintiff testified that she was panicky for the whole month and went into "hyperdrive" to put her life back together.  Plaintiff testified:  "[T]his was a very challenging time because I was trying to, you know, obviously protect my mom too.  So this became an . . . around-the-clock marathon to try and reconstruct a life from scratch with no assistance from anyone who was involved in this fire, or who was responsible for this fire, anything like that.  No assistance there ever, still to this day.  And trying to do all that, and in a really bad time.  It sent me into a -- quite a hysteria."  For months, she was unable to look for work.  Plaintiff had no address where she could receive scripts.  She could not try to get auditions.

Plaintiff's headaches and nightmares continued and she still had them two years later, when this matter was tried.  She regularly had terrifying nightmares.  She would wake up from the nightmares feeling panicky, disoriented and terrified.  The nausea she felt was horrible, causing her to feel like she had to throw up.  Plaintiff still had that

7

racing, panicky feeling currently. Plaintiff saw a psychiatrist. She still felt angry and outraged at how defendant treated her and this strong emotion became her only focus. So the circumstances affected her work and she no longer was interested in romantic relationships, marriage or having a family or a social life. All her time revolved around trying to get work. Since work was the only thing going on in her life, she became less able to handle rejection for parts.

Prior to the fire, according to Dr. James Rosenberg, a psychiatrist, plaintiff did not qualify for any psychiatric disorder. Prior to the fire, she was funny, upbeat and a particularly resilient person emotionally. According to Dr. Rosenberg, "[A]s a result of the fire, . . . she developed emotional injuries in the form of a depressive disorder, as well as post-traumatic stress disorder from the emotional traumas of the experience." At the time of the fire, riding down in the elevator traumatized plaintiff—she was in fear of being burnt alive and losing her life. Watching the fire outside "qualified" for emotional trauma in Dr. Rosenberg's view. Symptoms she developed from the fire experience and the feeling she was mistreated afterward included: intense anger and resentment; panic attacks; nightmares; withdrawal from friends, family and activities; and breaking up with her boyfriend.

Over time, the depressive symptoms improved so plaintiff no longer qualified for a disorder. Further, according to Dr. Rosenberg, her post-traumatic stress disorder improved to the point it became an anxiety disorder, not otherwise specified, with some residual features of post-traumatic stress disorder. However, she subsequently, as a result of the emotional traumas and chronic disrupted sleep, developed a bipolar spectrum disorder with the diagnosis bipolar disorder not otherwise specified. A diagnosis of bipolar disorder is "profoundly worrisome from a psychiatric standpoint" because of its long-term life implications. Plaintiff's bipolar disorder is a lifelong condition. Dr. Rosenberg testified, "The profound problems are . . . chronic impairment [of] function and loss of life milestones." There is a "significant chance," and "the most likely result[]" is: her acting career will fail; she will lose the ability to have meaningful relationships; she will never get married; and she will never have children. The

8

medications for this disorder would damage the fetus were she to become pregnant. Dr. Rosenberg testified these medications would cause: profound weight gain; diabetes and high cholesterol; a dulling of her mind; her to become sedated; the growth of facial hair; and menstrual changes. Because of her concerns about her health and appearance and preference to avoid medication, she probably would not take her medications consistently. Dr. Rosenberg testified plaintiff would most likely deteriorate as a majority of patients with bipolar disorder do not take their medications.

## 6. Repairs

The fire alarm system was required by law to be operable at all times and the repairs to the defective system were required to be performed immediately. Ms. Dexs did not instruct anyone to get the fire alarm system inspected quickly and was unaware of the timing or progress of any inspection. Nothing was done to repair the fire alarm system until after the October 26, 2009 inspection. The mini-horns were repaired on February 18, 2010. The smoke detectors were repaired after February 18, 2010. The emergency lighting was not corrected.

## B. Defendant's Case

On the date of the fire, there was evidence the heater in unit No. 102 was not on and did not cause the fire. Damage to the fire alarm wiring system likely caused by the fire could be the reason the 52 mini horns did not work after the fire.

### III.  PROCEDURAL MATTERS

#### A.  Background

In her first amended complaint, filed September 16, 2010, plaintiff alleges causes of action for contract and warranty of habitability breach, intentional emotional distress infliction and negligence.  Plaintiff also alleges causes of action for negligent infliction of emotional distress, bad faith retention of security deposit and unjust enrichment.  These latter three causes of action were not tried.

#### B.  Jury Verdict and Judgment

The jury returned a special verdict in plaintiff's favor on December 17, 2012.  On the contract breach cause of action, the jury found defendant breached plaintiff's lease by failing to maintain the premises in habitable condition, thereby causing her harm.  On the negligence claim, the jury found defendant failed to exercise reasonable care in the inspection, maintenance, "and/or" management of the building.  This, according to the jury, constituted a substantial factor in causing harm to plaintiff.  On the tortious breach of the warranty of habitability claim, the jury found defendant negligently or intentionally failed to keep plaintiff's apartment or the premises in a habitable condition, thereby damaging her.  On the intentional emotional distress infliction cause of action, the jury found:  defendant or his employees or agents engaged in outrageous conduct toward plaintiff; they acted with reckless disregard of the probability that plaintiff would suffer emotional distress as a result of this conduct; and this was a substantial factor in causing plaintiff to suffer severe emotional distress.  The jury also found defendant was liable for punitive damages.  Concerning the breach of the warranty of habitability and emotional distress claims, the jury found:  defendant and his agents or employees acted with malice, oppression or fraud; defendant knew of this conduct by his employees or agents and

10

ratified, adopted, or approved of it after it occurred and authorized it; and defendant had advance knowledge of the unfitness of any employee.

The jury awarded damages on all causes of action as follows: $338,250 in economic damages; $2 million in past and future noneconomic damages; for a total award of $2,338,250 in damages on multiple legal theories. Following a trial on punitive damages, the jury awarded $15 million in punitive damages against defendant. Judgment awarding plaintiff $17,338,250 was entered on December 18, 2012.

### C. Post-trial Motions, Judgment, Orders and Appeals

#### 1. The motions

On January 14, 2013, defendant filed motions for partial judgment notwithstanding the verdict and a new trial pursuant to Code of Civil Procedure sections 629 and 657, respectively. The motion for partial judgment notwithstanding the verdict was granted in part and denied in part. The new trial motion was granted.

Defendant's partial judgment notwithstanding the verdict motion challenged the punitive damage award and the two intentional tort claims (warranty of habitability breach and intentional emotional distress infliction). These two intentional tort claims served as the basis for the punitive damage award. Defendant contended the following findings were not supported by substantial evidence: the claims of implied warranty of habitability breach and intentional emotional distress infliction; the findings defendant "and/or" his employees acted with malice, oppression or fraud; his employees were unfit; and he had advance knowledge of his employees' unfitness or authorized or ratified their misconduct. Defendant further contended the punitive damages award was constitutionally excessive.

Defendant contended a new trial should be granted because: the evidence was insufficient to support the verdicts on the two intentional tort claims; the verdicts on the two intentional torts were against the weight of the evidence; and it was impossible to

11

determine which portions of the jury's compensatory damage award rested on the two intentional tort claims and which parts were based on the negligence and contract breach determinations. Defendant further contended a new trial should be granted because insufficient evidence supported the malice, advance knowledge and ratification findings. Defendant contended a new trial should be granted or a remittitur conditioned on a new trial should be ordered based on the excessiveness of the compensatory and punitive damages. Defendant asserted other grounds in his new trial motion which are not the subject of this appeal.

 2. The order partially granting defendant's judgment notwithstanding the verdict motion

On February 15, 2013, defendant's partial judgment notwithstanding the verdict motion was granted as to the intentional infliction of emotional distress claim and the punitive damage *amount*. Concerning the intentional infliction of emotional distress claim, the trial court found: defendant's post-fire conduct was not outrageous; defendant had not been shown to have intended to cause severe emotional distress; and the manager was not shown to have acted with reckless disregard of a probability that plaintiff would suffer emotional distress from the acts alleged. The post-fire conduct cited by the trial court in its extensive ruling consists of: the failure to provide temporary lodging and relocation assistance; the demand for rent on plaintiff's uninhabitable apartment; the threat to evict plaintiff and harm her credit; and the taking of plaintiff's security deposit for post-fire rent charges. The trial court found defendant's pre-fire conduct was not intended to cause plaintiff emotional harm nor done with a reasonable probability she would suffer emotional distress: "[T]here was no evidence sufficient to establish that defendant intended that any tenant, including plaintiff, would suffer emotional distress as a result of any failure to maintain the fire system. As to the alternative, acting with reckless disregard when the plaintiff was present, the evidence was insufficient to establish any act or omission in the presence of the plaintiff." The trial court identified as the pre-fire conduct the failure to properly inspect and maintain the fire protection system

12

and the related causation issue. As noted, in evaluating the pre-fire conduct, the trial court stated the context in which defendant's actions must be judged involved plaintiff's presence when the fire erupted. The trial court ruled, "This is a very personal type of tort with substantial qualifying requirements to distinguish it from negligent infliction of emotional distress and which occurs in only very few instances."

Concerning the amount of the punitive damages award, the trial court found there was substantial evidence: the required inspections of the fire detection system were not done; defendant and his employees knowingly disregarded the probably dangerous consequence; this could form the basis for a finding they acted with malice or oppression; there was substantial evidence defendant authorized or ratified his employees' misconduct; the employees were unfit for their jobs; and defendant employed them in conscious disregard of the danger to others.

But the trial court ruled the *amount* of the punitive damages award was unconstitutionally excessive. The trial court ruled a finding of "substantial reprehensibility" was supported by: the severe emotional distress and modest economic harm plaintiff suffered; defendant's significant reckless disregard for health and safety in failing to inspect and maintain the fire alarm system; evidence the failure to inspect and maintain the fire system was reckless; the jury awarded very substantial damages for emotional distress, indicating a punitive element to the exemplary damages award; and there is a disparity between the potential civil penalties and the punitive damages awarded. But in terms of the amount of the punitive damages, the trial court ruled, "[T]he court's finding of a high degree of reprehensibility of defendant's conduct, when considered with the other factors, warrants a higher ratio [than one to one] but no more than a multiplier of 2.5 to 1 [of the compensatory damages] as the constitutional limit." The trial court partially entered judgment notwithstanding the verdict on the amount of punitive damages. The trial court reduced the punitive damages award to $5,845,625. The court ruled, "[J]udgment . . . shall be in the total amount of $8,183,875."

The judgment notwithstanding the verdict motion on the breach of the warranty of habitability was denied. The trial court disagreed with defendant's contentions that, as a

matter of law, there is no right to tort damages for breach of the warranty of habitability. The court found substantial evidence supported the finding the warranty of habitability was breached.

### 3. Ruling on the new trial motion

The trial court granted a new trial on the issues of intentional infliction of emotional distress, because of insufficient evidence, and the punitive damage amount, as the award was excessive. The trial court stated, "The [new trial] motion is denied on all other grounds upon which the motion has been made." The trial court ruled the evidence was sufficient to support the verdict as to: the breach of the warranty of habitability claim; the amount of compensatory damage awarded; the finding of malice and oppression on the part of defendant's employees; and the finding defendant authorized and ratified their misconduct.

Concerning the claim for intentional emotional distress infliction, there was no evidence defendant's pre-fire conduct was directed primarily at plaintiff or in her presence. As noted, the pre-fire conduct involved failing to perform required inspections and to follow a policy regarding maintenance of a fire protection system. As to the post-fire conduct, according to the trial court, defendant's misconduct did not exceed "'all bounds of that usually tolerated in a civilized'" society. As noted, defendant's post-fire conduct consisted of: the failure to provide alternate accommodations; demands to plaintiff she be required to continue to pay rent; statements that the City of West Hollywood required her to take another apartment in the building; threatening plaintiff with eviction and harm to her credit; and threatening to keep her security deposit. As to the punitive damage award, the trial court found it was excessive because: defendant's conduct was in the lower mid-range of reprehensibility; the disparity between the actual and potential harm to plaintiff and the punitive damage award was great; the difference between the punitive damages and the civil penalties authorized was great; and

compensatory damages were substantial; and the substantial emotional distress award indicated a punitive damages component.

The trial court stated it was unable to grant a new trial subject to a remittitur. The trial court reasoned: the verdict form did not specify what emotional distress damages were awarded on each cause of action; it could not determine the amount awarded on the intentional emotional distress infliction claim; and, therefore, it could not determine what reduced amount could be the subject of a remittitur. Also, the verdict form did not indicate what punitive damages were awarded on the intentional infliction of emotional distress claim. Thus, according to the trial court, it could not determine whether a remittitur should be ordered or in what amount. The trial court ruled, "As a result, the court [ordered] a new trial of the entire action." The trial court ordered defendant to submit a proposed judgment to be entered as a result of the order partially granting his motion for judgment notwithstanding the verdict.

### 4. Post-ruling disputes and appeals

Defendant filed points and authorities contending that no new judgment should be entered at this time. Defendant reasoned: the February 15, 2013 order granting a new trial of the entire action vacated the December 18, 2012 judgment; as a result, there could only be one final judgment for purposes of the right to appeal; the entry of partial judgment notwithstanding the verdict on the emotional distress claim should be postponed pending the outcome of the new trial; and the partial judgment notwithstanding the verdict on the punitive damage amount should not be entered unless the Court of Appeal reverses the new trial order. In the alternative, defendant contended a conditional/interlocutory judgment should be entered on the emotional distress claim.

Plaintiff opposed defendant's proposed conditional/interlocutory judgment. Plaintiff contended the trial court's February 15, 2013 partial grant of judgment notwithstanding the verdict should be entered and is appealable. Plaintiff disputed defendant's interpretation of the February 15, 2013 order. Plaintiff argued the trial court

15

granted a partial new trial on the emotional distress cause of action and the amount of punitive damages only.

The trial court set an order to show cause hearing on the judgment, if any to be entered and, on March 20, 2013, the trial court ruled, "[B]ecause of the granting of the motion for a new trial on all issues, there should be no alteration, amendment or modification of the judgment previously entered." On March 29, 2013, plaintiff filed a notice of appeal. Defendant filed a notice of appeal and a protective cross-appeal.

# IV.  DISCUSSION

## A.  Judgment Notwithstanding the Verdict

### 1.  Standard of review of ruling granting judgment notwithstanding the verdict

Code of Civil Procedure section 629 provides, "The court, before the expiration of its power to rule on a motion for a new trial, either of its own motion, after five days' notice, or on motion of a party against whom a verdict has been rendered, shall render judgment in favor of the aggrieved party notwithstanding the verdict whenever a motion for a directed verdict for the aggrieved party should have been granted had a previous motion been made." We apply the following standard of review of the order partially granting judgment notwithstanding the verdict:  "The rules applicable to judgments notwithstanding the verdict for defendant are well settled[.] . . . Such a motion may be granted, properly, only when, disregarding the conflicting evidence, and indulging in every legitimate inference in favor of the plaintiff, the result is a determination that there is no evidence of substantial nature to support the verdict. The trial court, on such motion, is not permitted to weigh the evidence, and on an appeal from the judgment entered on the granting of such a motion, the appellate court must read the record in the light most advantageous to the plaintiff, resolve all conflicts in his favor, and give him the benefit of all reasonable inferences in support of the judgment." (*Quintal v. Laurel*

16

*Grove Hospital* (1964) 62 Cal.2d 154, 159; accord, *Cabral v. Ralphs Grocery Co*. (2011) 51 Cal.4th 764, 770 ["'A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support.'"].)

## 2. Order granting judgment notwithstanding the verdict on plaintiff's intentional emotional distress infliction claim

An intentional emotional distress infliction claim arises when: there is extreme and outrageous conduct done with the intention of causing emotional distress; or the reckless disregard of the probability of causing emotional distress; the plaintiff suffered severe or extreme emotional distress; and defendant's outrageous conduct is the legal cause of the emotional distress. (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050, *Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1001; *Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903.) Our Supreme Court explained: "A defendant's conduct is 'outrageous' when it is so ""'"extreme as to exceed all bounds of that usually tolerated in a civilized community."'"" [Citation.] And the defendant's conduct must be ""'"intended to inflict injury or engaged in with the realization that injury will result."' [Citation.]" (*Hughes v. Pair, supra,* 46 Cal.4th at pp. 1050-1051; see *Potter v. Firestone Tire & Rubber Co., supra,* 6 Cal.4th at p. 1001.) Our Supreme Court has held "'Behavior may be considered outrageous if a defendant (1) abuses a relation or position which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress. [Citations.]'" (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 946-947, disapproved on another ground in *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 574, fn. 4; *Christensen v. Superior Court*, *supra*, 54 Cal.3d at p. 903.) Our Supreme Court has synthesized the relevant rule: "It is not enough that the conduct be intentional and outrageous. It must be conduct directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware."

17

(*Christensen v. Superior Court, supra*, 54 Cal.3d at p. 903; see *Johnson v. Ralphs Grocery Co.* (2012) 204 Cal.App.4th 1097, 1109.) As explained by our Supreme Court: "'"[T]here is liability for conduct exceeding all bounds usually tolerated by decent society, of a nature which is *especially calculated to cause*, and does cause, mental distress of a very serious kind." [Citations.] . . .' [Citation.]" (*Christensen v. Superior Court, supra*, 54 Cal.3d at pp. 904-905, citing *Ochoa v. Superior Court* (1985) 39 Cal.3d 159, 165, fn. 5.)

Plaintiff contends partial judgment notwithstanding the verdict should not have been granted on the emotional distress claim because substantial evidence supports the jury's verdict. We disagree. The trial court correctly concluded that plaintiff did not establish that the post-fire conduct was either extreme or outrageous. Further, the trial court correctly ruled that there was no substantial evidence defendant's pre-fire conduct met the standard for an intentional emotional distress infliction claim. There was no substantial evidence defendant intended to cause, or engaged in conduct with the realization it would culminate in, mental distress of a very serious kind. Moreover, plaintiff did not establish that defendant's failure to maintain a properly operating fire protection system occurred: with knowledge of her presence; there was a substantial certainty she would suffer severe emotional injury; or was misconduct "directed primarily" at her. (*Potter v. Firestone Tire & Rubber Co., supra*, 6 Cal.4th at p. 1003; *Christianson v. Superior Court, supra*, 54 Cal.3d at pp. 903, 904.) The trial court correctly ruled the following did not constitute outrageous conduct that exceeded all bounds of a civilized society: failing to maintain the fire protection system; telling plaintiff she was required to move into another unit in the building; and, with knowledge the statement would upset plaintiff, telling her she would be evicted and have trouble renting elsewhere. (*Hughes v. Pair, supra,* 46 Cal.4th at pp. 1050-1051; *Potter v. Firestone Tire & Rubber Co., supra*, 6 Cal.4th at p. 1003.) There was no evidence that, before engaging in any pre or post-fire conduct, defendant, or his employees or agents, knew plaintiff was susceptible to injuries through mental distress. Further, there is no evidence defendant or his subordinates acted intentionally or unreasonably with the

18

recognition that the acts were likely to result in illness through mental distress. (Compare *Hailey v. California Physicians' Service* (2007) 158 Cal.App.4th 452, 475-476 [insurer deliberately waited until the insured had suffered severe injuries, was disabled, and was incurring mounting medical bills before it used old information to rescind the insurance policy]; *Hernandez v. General Adjustment Bureau* (1988) 199 Cal.App.3d 999, 1002, 1007 [insurance adjuster knew the claimant, the sole support of three children, was in a fragile emotional condition and susceptible to profound mental distress and in dire need of timely payments]; *Fletcher v. Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 392 [insurer embarked on a course of conduct designed to coerce a disabled claimant in dire financial straits into surrendering a disability policy].) We agree with the trial court that substantial evidence does not support the verdict as to the intentional emotional distress infliction claim.

### 3. Order denying judgment notwithstanding the verdict on the tort claim for breach of the implied warranty of habitability

Defendant contends no cause of action sounding in tort exists for breach of the implied warranty of habitability. This contention has no merit. The Courts of Appeal have held, "[A] tenant may state a cause of action in tort against his landlord for damages resulting from a breach of the implied warranty of habitability." (*Stoiber v. Honeychuck* (1980) 101 Cal.App.3d 903, 918-919; accord, *Jones v. Kelly* (1929) 208 Cal. 251, 254-256 [a tenant may sue in tort, and recover actual and punitive damages, for a landowner's malicious or oppressive conduct in breach of a rental agreement that renders the premises uninhabitable]; *Erlach v. Sierra Asset Servicing, LLC* (2014) 226 Cal.App.4th 1281, 1298 ["a tenant may maintain a tort action against his landlord for damages . . . caused by the landlord's failure to keep the premises in a habitable condition"]; *Burnett v. Chimney Sweep* (2004) 123 Cal.App.4th 1057, 1070 [tort claim may be filed when a residential lessor allows a dangerous or unsafe condition to exist on the property]; *Smith v. David* (1981) 120 Cal.App.3d 101, 112, fn. 3 [a tenant "may seek general and punitive damages

19

for . . . breach of warranty [of habitability]".)  The trial court correctly denied the motion for judgment notwithstanding the verdict as to the breach of implied warranty of habitability tort claim.

### 4.  Judgment notwithstanding the verdict on punitive damages

The trial court entered partial judgment notwithstanding the verdict on the punitive damage award.  The trial court reduced the jury's punitive damage award from $15 million to $5,845,625.  The trial court ruled the amount of the jury's punitive damage award was excessive.  The trial court denied defendant's judgment notwithstanding the verdict on the issue of his *liability* for punitive damages.  As noted, defendant's breach of the habitability warranty can give rise to punitive damages.  (*Jones v. Kelly*, *supra*, 208 Cal. at pp. 254-256; *Smith v. David*, *supra*, 120 Cal.App.3d at p. 112, fn. 3.)  And while assessing whether punitive damages could be imposed, the trial court did so solely in the context of plaintiff's claim for habitability warranty breach.  There is no merit to defendant's legally and factually unsupported claim that the punitive damages award must be reversed because of the intentional emotional distress infliction cause of action.  The context of the trial court's written order was that it was assessing the amount of punitive damages in the context of plaintiff's habitability warranty breach claim.

Defendant contends substantial evidence does not support the finding of liability for punitive damages on plaintiff's breach of the habitability warranty claim.  Defendant reasons there is no substantial evidence to support a malice, oppression or fraud finding.  Additionally, defendant reasons substantial evidence does not support the jury finding he was liable for his employees' conduct as required by Civil Code, section 3294.  Each party challenges the reduced amount of the award, plaintiff on the ground the jury's award was not constitutionally excessive and defendant asserts the reduced amount, $5,845,625, violates due process.

First, as to the *liability* for punitive damage issues, substantial evidence supports the trial court's ruling.  We apply the following standard of review to an order granting or

20

denying a judgment notwithstanding the verdict motion: "'A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support. [Citation.] [¶] . . . As in the trial court, the standard of review [on appeal] is whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion.' (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.)" (*Cabral v. Ralphs Grocery Co., supra,* 51 Cal.4th at p. 770.) We have already reiterated the pertinent facts and the trial court's factual and legal response thereto. We need not reiterate the pertinent facts in detail. There is substantial evidence defendant personally harbored malice towards plaintiff. Defendant stipulated: he took her security deposit despite the fact the premises were not habitable; he charged plaintiff rent for her apartment after the fire; he never offered to pay for any temporary lodging for plaintiff after the fire; and he never paid any relocation benefits. Also, there was evidence of a failure of the building's fire alarm system ultimately rendering the building uninhabitable. Further, there was substantial evidence that defendant's employees knew full well of the defective nature of the building. Also, the jury could reasonably conclude that nothing was done to ensure compliance with an alleged policy concerning fire inspections. And the jurors were free to disregard defendant's self-serving testimony to the contrary, some of which conflicted with other evidence. No inspection of the fire alarm system was conducted until four weeks after the fire. Despite the fact there was no functioning alarm system, defendant and his employees moved tenants back into the building. Finally, there was evidence that Ms. Bustamonte threatened to evict plaintiff. Ms. Bustamonte also advised plaintiff her credit would be ruined and she would be unable to secure suitable housing. Ms. Wong instructed Ms. Bustamonte to threaten plaintiff with eviction. (Civ. Code, § 3294; *Harris v. Dixon Cadillac Co.* (1982) 132 Cal.App.3d 485, 493-494; Witkin, 6 Summary of Cal. Law (10th ed. 2005) Torts, § 1573, pp. 1062-1063.)

Apart from the issue of malice, there was substantial evidence of ratification and authorization so as to hold defendant liable for punitive damages. (Civ. Code, § 3294,

21

subd. (b).)  Defendant never repudiated his subordinates' conduct.  At his deposition, defendant was confronted with the allegation he was renting units that did not have fire alarms.  Defendant responded, "'So what.'"  Moreover, defendant took plaintiff's security deposit despite and charged her rent knowing the apartment was uninhabitable.  Further, we have reviewed defendant's testimony and the jury could reasonably conclude he was untruthful given other circumstantial evidence of his complicity in the foregoing misconduct.  (*Hartman v. Shell Oil Co.* (1977) 68 Cal.App.3d 240, 249; *Coats v. Construction & General Laborers Local No. 185* (1971) 15 Cal.App.3d 908, 915; see Witkin, *op. cit.*, § 1582, pp. 1074-1076.)  The foregoing also supports plaintiffs' authorization and employee unfitness contentions.  Substantial evidence supports the trial court's ruling that defendant was *liable* for punitive damages.

Second, defendant contends the trial court's finding that the $15 million punitive damage award was excessive must be affirmed.  However, because of the unique procedural and factual scenario presented by this case, any issue concerning the excessiveness of the punitive damage award is moot.  As we noted, we have upheld the order granting a new trial on all issues.  That trial will not involve plaintiff's intentional emotional distress infliction cause of action.  Further, the evidence at the new trial will most likely differ from that of the proceeding we are now reviewing.  Thus, because we do not know what that evidence is, we cannot grant any effectual relief to defendant concerning the excessiveness of the punitive damage award.  And, the jury verdict never distinguished between the two tort claims.  A new trial order vacates the judgment.  (*Lapique v. Walsh* (1923) 191 Cal. 22, 24 ["the granting of a new trial vacates the judgment which has been rendered after the trial and in pursuance thereof"]; *Pacific Corporate Group Holdings, LLC v. Keck* (2014) 232 Cal.App.4th 294, 302 ["'When a motion for a new trial is granted the judgment is vacated'"].)

Thus, the grant of the new trial renders any discussion concerning the punitive damage amount moot.  This conclusion flows from the unique procedural and factual scenario present in this case.  There is a complete uncertainty as to the evidence that will be presented during the new trial.  Whatever is the effect of the trial court's excessiveness

22

finding in connection with the first trial, it is speculative as to its impact in the retrial. We cannot afford defendant any effectual relief as to the punitive damage amount because common sense tells us there will be a different retrial. (See *Lane v. Hughes Aircraft Co*. (2000) 22 Cal.4th 405, 416 ["The new trial may result in a defense verdict, which would make them moot."]; *Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541 [an appeal is moot when an appellate court cannot grant a litigant "any effectual relief"].) Thus, any contention concerning the excessiveness finding is now moot because a new trial will ensue.

Our conclusion concerning the punitive damage amount is different from the right to secure an exemplary damage award. If we ruled that plaintiff could not have recovered punitive damages *at* the first trial, such a ruling would bar a retrial on that issue. But in terms of the *quantity* of allowable punitive damages, that is dependent upon the development of facts in the retrial. Again, it bears reemphasis that this particular issue arises in a unique litigation environment.

### B. New Trial Order

#### 1. The trial court's ruling and the parties' contentions

As previously explained, a new trial was ordered on the intentional emotional distress infliction claim on the ground insufficient evidence supported the verdict. And the trial court ordered a new trial on the punitive damages issue on the basis they were excessive on constitutional and state law grounds. The trial court declined to issue a new trial order subject to a remittitur of damages. The trial court's written order states in part: "Concluding that the insufficiency of the evidence on the [emotional distress] claim and the excessive award of punitive damages warrant granting a new trial, the court has considered whether to grant a new trial subject to a remittitur. However, because the verdict form did not specify what damages for emotional distress were being awarded on what cause of action, the court is unable to determine what amount, if any, was awarded

23

on the [emotional distress] claim and, therefore, [cannot] determine what reduced amount could be the subject of a remittitur. Similarly, because the verdict form does not indicate what, if any, punitive damages were awarded on the [emotional distress] claim, the court [cannot] determine whether a remittitur should be ordered or in what amount. As a result, the court hereby orders a new trial on the entire action." Plaintiff contends the court erred in granting a complete new trial on all issues. Defendant contends the trial court did not abuse its discretion.

### 2. Procedure on motion for new trial and standard of review

Code of Civil Procedure section 657 provides: "The verdict may be vacated and any other decision may be modified or vacated, in whole or in part, and a new or further trial granted on all or part of the issues, on the application of the party aggrieved, for any of the following causes, materially affecting the substantial rights of such party: [¶] . . . [¶] 5. Excessive or inadequate damages. [¶] 6. Insufficiency of the evidence to justify the verdict or other decision, or the verdict or other decision is against law. [¶] . . . [¶] When a new trial is granted, on all or part of the issues, the court shall specify the ground or grounds upon which it is granted and the court's reason or reasons for granting the new trial upon each ground stated. [¶] A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision, nor upon the ground of excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision. [¶] . . . [I]f the motion is granted [the court] must state the ground or grounds relied upon by the court, and may contain the specification of reasons. . . . [¶] On appeal from an order granting a new trial[,] . . . (a) the order shall not be affirmed upon the ground of the insufficiency of the evidence to justify the verdict or other decision, or upon the ground of excessive or inadequate damages, unless such ground is stated in the order granting the motion and (b) on appeal from an order granting a new trial upon the ground of the insufficiency of the

24

evidence to justify the verdict or other decision, or upon the ground of excessive or inadequate damages, it shall be conclusively presumed that said order as to such ground was made only for the reasons specified in said order or said specification of reasons, and such order shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons."

We apply the following standards of review of the new trial order: "The standards for reviewing an order granting a new trial are well settled. After authorizing trial courts to grant a new trial on the grounds of '[e]xcessive . . . damages' or '[i]nsufficiency of the evidence,' section 657 provides: '[O]n appeal from an order granting a new trial upon the ground of the insufficiency of the evidence . . . or upon the ground of excessive or inadequate damages, . . . *such order shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons*.' (Italics added.) Thus, we have held that an order granting a new trial under section 657 'must be sustained on appeal unless the opposing party demonstrates that no reasonable finder of fact could have found for the movant on [the trial court's] theory.' (*Jones* [*v. Citrus Motors Ontario, Inc.* (1973) 8 Cal.3d 706, 710 (*Jones*)].) Moreover, '[a]n abuse of discretion cannot be found in cases in which the evidence is in conflict and a verdict for the moving party could have been reached . . . .' (*Id.* at p. 711.) In other words, 'the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the [new trial] order.' (*Neal* [*v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 932 (*Neal*)].) [¶] The reason for this deference 'is that the trial court, in ruling on [a new trial] motion, sits . . . as an independent trier of fact.' (*Neal*, *supra*, 21 Cal. 3d at p. 933.) Therefore, the trial court's factual determinations, reflected in its decision to grant the new trial, are entitled to the same deference that an appellate court would ordinarily accord a jury's factual determinations. [¶] The trial court sits much closer to the evidence than an appellate court. Even the most comprehensive study of a trial court record cannot replace the immediacy of being present at the trial, watching and hearing as the evidence unfolds. The trial court, therefore, is in the best position to assess the reliability of a jury's verdict and, to this end, the Legislature has granted trial courts

25

broad discretion to order new trials. The only relevant limitation on this discretion is that the trial court must state its reasons for granting the new trial, and there must be substantial evidence in the record to support those reasons. (*Jones*, *supra*, 8 Cal.3d at p. 710.)" (*Lane v. Hughes Aircraft Co.*, *supra*, 22 Cal.4th at pp. 411-412; accord, *Whitlock v. Foster Wheeler, LLC* (2008) 160 Cal.App.4th 149, 159 ["'Review is limited to the inquiry whether there was any support for the trial judge's ruling, and the order will be reversed only on a strong affirmative showing of abuse of discretion'"].) Courts have also stated the rule for reviewing the order granting a new trial as follows: "'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears. This is particularly true when the discretion is exercised in favor of awarding a new trial. . . . So long as a reasonable or even fairly debatable justification under the law is shown for the order granting the new trial, the order will not be set aside.' [Citation.]" (*McCoy v. Pacific Maritime Assn* (2013) 216 Cal.App.4th 283, 303, citing *Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387.)

### 3. Emotional distress and punitive damage analysis

#### a. Intentional emotional distress infliction

Plaintiff contends the new trial order must be reversed because it is infected with the same legal errors as the trial court's judgment notwithstanding the verdict. As we have upheld the partial judgment notwithstanding the verdict order, this contention has no merit. Plaintiff also contends the trial court failed to consider all the evidence in ruling on the new trial motion. (See Code Civ. Proc., § 657.) We review this contention by reviewing the record before us: "'[W]hen [a] court has acted and granted a new trial, we must *presume* that the trial court did consider the whole record and decided that . . . prejudicial error [had been committed], and unless an inspection of the record convinces us that it is otherwise, we will not disturb the order.' [Citations.]" (*Maher v. Saad*

(2000) 82 Cal.App.4th 1317, 1324; see *Pitt v. Southern Pacific Co.* (1932) 121 Cal.App. 228, 238.)  Upon inspection of the record, it is clear the trial court considered the entire record.  The trial court even reviewed the specific evidence plaintiff argues was not considered.  Moreover, plaintiff fails to identify any relevant evidence not considered by the trial court.  This contention has no merit.

### b.  punitive damages

Plaintiff contends the court erred in granting a new trial on the punitive damage amount.  Plaintiff asserts the same reasons she did in connection with the order granting partial judgment notwithstanding the verdict.  Plaintiff does not contend there is no basis in the record for any of the trial court's reasons.

As plaintiff's appeal is from a new trial order, we do not conduct de novo review of whether the award is constitutionally excessive.  We conduct de novo review of a judgment awarding punitive damages.  (See *Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1172 [on appeal from the judgment awarding punitive damages, the constitutional excessiveness of the award is reviewed de novo]; see *Izell v. Union Carbide Corporation* (2014) 231 Cal.App.4th 962, 982.)  Rather, our review is limited to whether there is a basis in the record for any of the trial court's reasons for granting a new trial on the amount of punitive damages.  Plaintiff has the burden of demonstrating error under the applicable standard of review.  (See *City of Salinas v. Souza & McCue Construction Co.* (1967) 66 Cal.2d 217, 225, disapproved on another point in *Helfend v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 14.)  Plaintiff did not carry this burden by demonstrating that a de novo determination should conclude the jury's punitive damage award is not excessive.  Plaintiff makes no showing that there is no basis in the record for any of the trial court's reasons for granting a new trial on the issue of punitive damages.

## 4. Scope of the new trial

Plaintiff contends the court erred in ordering a new trial of the entire action. Plaintiff argues the new trial should be limited to the intentional emotional distress infliction cause of action and the amount of punitive damages. Plaintiff reasons the verdicts on all the other issues were either correctly decided by the jury or unchallenged by defendant. Additionally, defendant contends the order for a complete new trial was not an abuse of discretion.

The decision concerning whether the new trial should be limited rests in the discretion of the trial court. Our Supreme Court has explained: "A reviewing court should not modify an order granting a new trial on all issues to one granting a limited new trial 'unless such an order should have been made as a matter of law.' [Citation.]" (*Schelbauer v. Butler Mfg. Co.* (1984) 35 Cal.3d 442, 456.) "[A limited retrial] should be granted . . . only if it is clear that no injustice will result. (*Gasoline Products Co.* v. *Champlin Refining Co.* [(1931)] 283 U.S. 494, 499 [] . . . .) . . . [A] request for such a trial should be considered with the utmost caution [citations] and . . . any doubts should be resolved in favor of granting a complete new trial. [Citation.]" (*Leipert v. Honold* (1952) 39 Cal.2d 462, 466-467; *Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 696.) If there are any doubts on the subject, a complete new trial must be held if one party would be prejudiced by a limited retrial. (*Liodas v. Sahadi* (1977) 19 Cal.3d 278, 285-286; *Leipert v. Honold*, *supra*, 39 Cal.2d at pp. 466-467.) Our Supreme Court has explained: "'When a limited retrial might be prejudicial to either party, the failure to grant a new trial on all of the issues is an abuse of discretion.' [Citation.]" (*Liodas v. Sahadi*, *supra,* 19 Cal.3d at p. 286; see *Curties v. Hill Top Developers, Inc.* (1993) 14 Cal.App.4th 1651, 1656-1657.)

Here, without abusing its discretion, the trial court could rule a complete new trial must be held, because: liability and damages are inextricably intertwined; a retrial of damages necessitates a retrial of all causes of action (apart from the intentional emotional distress infliction claim); the jury's compensatory damages award does not indicate how

28

much was awarded for intentional emotional distress infliction; the intentional emotional distress infliction claim may not be retried; and the amount of punitive damages must be retried.

Punitive damages are based on *conduct* the jury finds constituted oppression, fraud or malice. (Civ. Code, § 3294; *Medo v. Superior Court* (1988) 205 Cal.App.3d 64, 68 ["Punitive damages . . . must be tied to oppression, fraud or malice *in the conduct which gave rise to liability in the case*"]; *Notrica v. State Comp. Ins. Fund* (1999) 70 Cal.App.4th 911, 947.) Compensatory damages, too, are based on the conduct giving rise to liability. (E.g. *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821 [damages for breach of contract]; *Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP* (2014) 59 Cal.4th 568, 573 [damages for negligence]; *Stoiber v. Honeychuck*, *supra*, 101 Cal.App.3d at pp. 918-919 [damages for tortious breach of warranty of habitability]; *Hughes v. Pair*, *supra*, 46 Cal.4th at p. 1050 [damages for intentional infliction of emotional distress].) The damages verdict does not reveal what conduct the jury found was the basis for the compensatory and punitive damages awards. A second jury cannot know what the acts were that the first jury found gave rise to liability for compensatory and punitive damages. Accordingly, the order for a complete new trial was not an abuse of discretion. (Compare *Schelbauer v. Butler Manufacturing, Co.* (1984) 35 Cal.3d 442, 457 [because "the damage award [was] incorrect only to the extent that it reflect[ed] an improper apportionment of liability, the trial court should have limited its new trial order to that issue"].)

In her reply brief, plaintiff argues the new trial order must be reversed if partial judgment notwithstanding the verdict is not reversed. Plaintiff relies on Code of Civil Procedure, section 629, which provides: "If the court grants the motion for judgment notwithstanding the verdict or of its own motion directs the entry of judgment notwithstanding the verdict and likewise grants the motion for a new trial, the order granting the new trial shall be effective only if, on appeal, the judgment notwithstanding the verdict is reversed, and the order granting a new trial is not appealed from or, if appealed from, is affirmed." Plaintiff's citation to Code of Civil Procedure section 629 is

inapposite.  The section does not apply, because it does not address orders granting *partial* judgment notwithstanding the verdict.  (*Beavers v. Allstate Ins. Co.* (1990) 225 Cal.App.3d 310, 331.)  No abuse of discretion occurred.

## V.  DISPOSITION

The orders under review are affirmed. Upon remittitur issuance, a complete new trial is to occur on all the claims except the cause of action for intentional emotional distress infliction.  All parties are to bear their own costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

We concur:

MOSK, J.

GOODMAN, J. [*]

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.